

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

1-4-2007

# USA v. Korey

Precedential or Non-Precedential: Precedential

Docket No. 05-3840

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

Recommended Citation

"USA v. Korey" (2007). *2007 Decisions.* Paper 1710.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/1710

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

No. 05-3840

———

UNITED STATES OF AMERICA

v.

JASON KOREY,

Appellant

———

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. No. 04-cr-00015)
District Judge:  Honorable Gary L. Lancaster

———

Argued October 25, 2006
Before:  SMITH, FISHER and COWEN, *Circuit Judges*.

(Filed January 4, 2007)

Karen S. Gerlach
Lisa B. Freeland (Argued)
Office of Federal Public Defender
1001 Liberty Avenue

1450 Liberty Center
Pittsburgh, PA  15222
    *Attorneys for Appellant*

Laura S. Irwin (Argued)
Office of United States Attorney
700 Grant Street, Suite 4000
Pittsburgh, PA  15219
    *Attorneys for Appellee*

———

OPINION OF THE COURT

———

FISHER, *Circuit Judge*.

Jason Korey appeals from his conviction on one count of using a firearm during and in relation to a conspiracy to distribute cocaine.  He argues (1) that the jury instructions concerning conspiracy violated his right to due process because they contained an impermissible mandatory presumption, (2) that his Sixth Amendment right to be present at his trial was violated when the judge and the prosecutor had an ex parte meeting about an improper comment the prosecutor made in the courtroom, (3) that his right to a fair trial was violated both by the prosecutor's apology for foul language that bolstered the prosecutor's reputation and by improper statements during closing argument, and (4) that the District Court erred in excluding evidence that Korey had been acquitted in an earlier murder trial – a trial that had been mentioned by a potential juror during jury selection.  For the reasons stated below, we

agree that the jury instructions contained an impermissible mandatory presumption that was not harmless beyond a reasonable doubt. Consequently, we will vacate Korey's conviction.

## I.

For a number of years in the late 1990s, Billy Kuhn and Ray Erfort worked together as cocaine and crack dealers in the South Hills of Pittsburgh. Jason Korey knew both men, and was aware that they were drug dealers.

When Erfort was arrested in 1998, he attempted to prevent the police from finding his drug stash by asking Kuhn to collect it. Kuhn gathered 29 ounces of cocaine with a street value of $30,000. After his release from jail, Erfort asked Kuhn to return the cocaine, but Kuhn refused.

According to the Government, Erfort later approached Korey, who was seventeen years old at the time, and offered him cocaine in exchange for killing Kuhn. Korey, in turn, obtained a .22-caliber handgun with a silencer from a friend, ostensibly to use in the murder. According to the Government, he then either murdered Kuhn himself on the morning of July 9, 1999, or had his friend Dave Clemons murder Kuhn for him on that date. However, after police discovered the body, they charged Ray Erfort and Milton Morgan with Kuhn's murder.

On October 22, 1999, the police, who had an outstanding warrant for Korey's arrest based on other circumstances, received an anonymous telephone tip concerning his whereabouts. They arrested him based on the outstanding warrant. At the time of his arrest, Korey had illegal drugs and

3

other contraband on his person, and the arresting officers prepared charges against him based on this contraband.

Later that day, Korey, while still in police custody, devised a deal to keep himself out of jail for possession of the contraband: he offered to provide information about Kuhn's murder if they would agree to keep him out of jail on the present charges. After agreeing to this deal in writing, Korey told the officers that Erfort had paid him cocaine to kill Kuhn, and that he had turned to Clemons to carry out the murder for him. He also told the police where he and Clemons had hidden the murder weapon. The police recovered the murder weapon from the location Korey described.

Following this confession, the murder charges against Erfort and Morgan were dropped, and Korey was charged. However, he was acquitted of the murder charge after a state court trial on November 2, 2000.

Several years later, Korey was indicted on federal firearms charges stemming from the incident. He pleaded guilty to possessing a silencer and possession of a firearm by a drug user or addict. As to the remaining charges, he was acquitted of one count of possessing a stolen firearm, and convicted of using a firearm during and in relation to a conspiracy to distribute cocaine. It was during the trial for these charges that the alleged errors Korey complains of occurred.

Before the trial began, the Government filed a motion in limine to exclude evidence that Korey had been acquitted of Kuhn's murder in state court. The District Court heard argument on the issue, but reserved judgment. Later, after the jury venire was sworn, the group of prospective jurors were

asked whether they knew Jason Korey. One of the prospective jurors responded in the presence of other jurors that he knew a Jason Korey who "was allegedly involved in a murder." This same juror expressed reluctance to serve on the jury because of his "prior experience with Mr. Korey, and [because he was] aware of some previous allegations." Although this prospective juror was dismissed for cause, defense counsel[1] argued that the jury panel should be dismissed. The District Court denied this request and also determined, over Korey's objection, that it would not admit evidence of Korey's state court acquittal.

During the trial, one of the Government's police witnesses had trouble recalling events surrounding his search for a stolen weapon. When the witness was excused to review his reports in the hallway, defense counsel requested to see what he was reviewing. After the District Court indicated that defense counsel would be able to review a copy for cross examination, the prosecutor responded with inappropriate language in the jury's presence. The District Judge demanded to see the prosecutor in his chambers. When the attorney for the Government emerged, he recited the following apology in front of the jury on the District Court's request:

> Your Honor, before I begin with the testimony of this witness, I have some remarks for you, for Mr. Hackney, and for the Jury.
>
> I have been an [A]ssistant U.S. [A]ttorney in this district since 1991, and I have appeared in front of you as well as other judges in this Court,

---

[1]Appellate counsel was not trial counsel in this matter.

and you should know that even though this is how I make my living, it is more than a living to me, and it is something that's important to me, and I take pride in what I do and who I do it for and in the way I do it.

I try to try these cases to the best of my ability, not only for the convenience of the jury, but with respect for the Court, with respect to the parties, and with respect to the witnesses and anybody else who might be involved in the system.

That broke down today. I expressed frustration because of something that was happening here. I want the Court to know that I was not expressing irritation at you as the judge, at Mr. Hackney as opposing counsel – we have been friends for many years – or as a measure of disrespect towards this Court or for this jury.

It was inexcusable, but it was borne in a moment of frustration in the interruption of the trial, which is something that I would liked to have gone more smoothly for the benefit of all concerned.

You have known me for many years, I have been in and out of the courtroom. I hope you understand that this was not a picture of me at my best, but it was just a moment of frustration. I am sincerely sorry for it.

> If anyone was offended by it, I want you to know now that I would not have done it otherwise, and I'm extremely sorry.

The following morning, defense counsel objected to this speech and asked for a mistrial, but was overruled by the District Court.

As the trial progressed, it became increasingly clear that the two sides had different views about what constituted a drug distribution conspiracy. The Government's theory was that a jury could find that Korey was guilty of using a firearm during and in relation to a drug conspiracy because (1) he agreed to commit a murder in exchange for cocaine, and (2) in order to avenge a drug rip-off, Korey used the .22-caliber handgun either by shooting Billy Kuhn or by giving it to Clemons to do so. Defense counsel, on the other hand, maintained that agreeing to provide a service – even an unlawful one – in exchange for cocaine constituted a buyer-seller relationship and not a drug distribution conspiracy.

On the final day of the trial, counsel met with the District Judge to discuss the jury instructions. Over objections by the defense, the District Court determined that it would instruct the jury that Korey was, as a matter of law, a member of a drug distribution conspiracy if he either (1) agreed to accept cocaine in payment for killing Billy Kuhn, or (2) agreed to murder Billy Kuhn for Ray Erfort in order to avenge Kuhn's theft of Erfort's cocaine.

After the jury deliberated, Korey was acquitted of possessing a stolen firearm and convicted of using a firearm during and in relation to a drug distribution conspiracy. He now appeals, asking this Court to order a new trial based on four

7

errors: (1) improper jury instructions, (2) a violation of his right to be present at an ex parte meeting between the prosecutor and the judge, (3) the prosecutor's prejudicial comments in his apology and during closing argument, and (4) the District Court's improper exclusion of evidence of his acquittal in the state court trial for Billy Kuhn's murder.

## II.

Korey's first complaint is that the jury instructions used in his trial were erroneous. Specifically, he argues that the instructions concerning the count for using a firearm during and in relation to a drug conspiracy contained an erroneous conclusive presumption. That presumption, he contends, relieved the Government of its duty to prove all essential elements of the crime beyond a reasonable doubt. We exercise plenary review over challenges to the legal standards expressed in jury instructions. *See*, *e.g.*, *United States v. Zehrbach*, 47 F.3d 1252, 1260 (3d Cir. 1995).

Due process requires that the Government prove every element of the charged offense beyond a reasonable doubt. *In re Winship*, 397 U.S. 358, 364 (1970). Accordingly, jury instructions that relieve the Government of this burden violate a defendant's due process rights. *Carella v. California*, 491 U.S. 263, 265 (1989). The inquiry is whether the court's instruction constituted a mandatory presumption by "directly foreclos[ing] independent jury consideration of whether the facts proved established certain elements of the offense with which [the defendant] was charged." *Id.* at 266.

In this case, Korey was charged with violating 18 U.S.C. § 924(c)(1)(A), which punishes "any person who, during and in

8

relation to any crime of violence or drug trafficking crime . . . uses or carries a firearm." The drug trafficking crime charged by the Government in relation to § 924 here is conspiracy to distribute cocaine under 21 U.S.C. §§ 846 and 841(a)(1).

It is clear from our prior cases that an important element of a conspiracy to distribute cocaine is that the parties shared a common goal. In *United States v. Cartwright*, 359 F.3d 281 (3d Cir. 2004), for example, we considered a convicted criminal defendant's claim that the guilty verdict against him for conspiracy to distribute cocaine was not supported by sufficient evidence. Describing what the evidence must prove, we explained that "[o]ne of the requisite elements the government must show in a conspiracy case is that the alleged conspirators shared a 'unity of purpose', the intent to achieve a common goal, and an agreement to work together toward the goal." *Id.* at 286 (quoting *United States v. Wexler*, 838 F.2d 88, 90-91 (3d Cir.1988)); *see also United States v. Gibbs*, 190 F.3d 188, 197 (3d Cir. 1999) ("To prove a conspiracy, the government must establish a unity of purpose between the alleged conspirators, an intent to achieve a common goal, and an agreement to work together toward that goal."). In other words, because the conspiracy charged here is a conspiracy to distribute cocaine, the Government must prove beyond a reasonable doubt that Korey shared a goal with his co-conspirators to further the purpose of distributing cocaine.

The jury instructions, however, did not require the jury to find a unity of purpose. Rather, the District Court instructed jurors that:

> The Government in this case alleges that
> Mr. Korey committed the crime of conspiracy to

9

distribute cocaine and did so in two separate ways.

First, when he agreed to accept drugs from Ray Erfort as payment for the murder of Billy Kuhn. I instruct you that if you find that the defendant agreed to accept cocaine in payment for killing Billy Kuhn, that is a conspiracy to distribute cocaine.

And, second, the Government alleges that Mr. Korey agreed to murder Billy Kuhn for Ray Erfort in order to avenge Kuhn's theft of Erfort's cocaine. I instruct you that if you find that defendant agreed to murder Billy Kuhn for Ray Erfort in order to avenge Kuhn's theft of Erfort's cocaine, that is also conspiracy to distribute cocaine.[2]

Under these instructions, all the jurors had to find was that Korey agreed to accept cocaine in payment for killing Kuhn. They did not have to consider whether the Government met its burden of proof in establishing a unity of purpose. Their verdict on the conspiracy charge was to be the same whether or not they believed the government had proven beyond a reasonable doubt

---

[2]Although the instructions provide two routes for the jury to find that Korey was involved in a conspiracy to distribute cocaine, we are unable to say on which one the jury based its conviction. Because we find that the first is legally flawed, we do not discuss the second – though we do note in passing that it seems to suffer from the same defect as the first.

10

that Korey and Erfort shared a common goal to distribute cocaine. This is certainly at odds with the definition of conspiracy we expressed in *Cartwright*. 359 F.3d at 286.

Defending the instructions, the Government argues that the statements at issue do not constitute error because other parts of the instructions discussed the complete definition of a conspiracy. Indeed, the instructions did provide a general definition of conspiracy, including an explanation that "[t]here must be intentional participation by the defendant in the specific conspiracy charged, with a view to furthering the common design and purpose of the conspiracy." However, this complete and correct statement of the law does not overcome the language that followed, which amounted to an improper mandatory presumption. Even if jurors took to heart the general definition of a conspiracy, they were instructed that if they found "that the defendant agreed to accept cocaine in payment for killing Billy Kuhn, that is a conspiracy to distribute cocaine." Regardless of what the District Court may have advised elsewhere, this statement "directly foreclosed independent jury consideration of whether the facts proved established certain elements of the offense with which [the defendant] was charged." *Carella*, 491 U.S. at 266. Although the jury was told that a conspiracy required a shared purpose, it was also told that Korey's actions amounted to participation in a conspiracy whether or not they believed that he shared the goal of furthering Erfort's cocaine distribution operation. If the jurors believed that he agreed to accept cocaine in exchange for killing Kuhn, that was the end of their inquiry.

The Government also contends that the instructions were not faulty because by agreeing to accept cocaine as payment for

11

murdering Kuhn, Korey was serving an enforcement role in the conspiracy to distribute cocaine. As an initial matter, there is an important difference between considerations of the sufficiency of evidence and the propriety of jury instructions. Even if there was ample evidence that Korey shared a common goal to advance Erfort's scheme to distribute cocaine, the jury instructions must not command the jury in a manner that forecloses their consideration of that element of the crime. *Carella*, 491 U.S. at 266.

But assuming the Government is arguing not about the sufficiency of evidence, but that the jury instructions were correct as a matter of law because the mandatory presumption was proper, the law on point simply does not comport with the Government's argument. Although we have recognized that an enforcement role is part of a conspiracy to distribute drugs, we have always rested on a showing that the enforcer shared the goal of the overarching drug-distribution conspiracy. In *United States v. Gonzalez*, 918 F.2d 1129 (3d Cir. 1991), for example, we considered, in the context of a challenge to the sufficiency of evidence supporting a conviction, whether a defendant was part of a conspiracy to distribute cocaine based on serving as the "muscle" for the operation. As we explained:

> Considering the placement of [the defendant's] gun, the fact that he was in the kitchen with [the co-conspirators] at the time of the arrest and his act of blocking the Detective's way out of the apartment, it was reasonable for the jury to conclude that [the defendant] was the "muscle" of the group and he was there to protect the money and the cocaine. In addition, [the defendant] was

12

> present the night before the transaction when [the co-conspirators] tried to store the cocaine at [another's] apartment, and [one of the co-conspirators] "invited" him to be present at the apartment again the next day while the transaction was taking place in the back bedroom.

*Id.* at 1136. In other words, based on the circumstances, a jury could have inferred that the defendant shared the goal of making sure cocaine was distributed. The defendant's specific role was to provide the "muscle" to protect the transactions, but his overarching goal was clearly the same as other members of the conspiracy: distribution of cocaine.

The Government also attempts to rely on the Fifth Circuit case of *United States v. Baptiste*, 264 F.3d 578 (5th Cir. 2001). It claims that *Baptiste* is analogous to the case before us because the court found a conspiracy based on the fact that "many of the appellants responded to the murders of their friends with killing sprees against the rival group of drug dealers." *Id.* at 587.

However, in reviewing a defendant's conviction to determine whether there was sufficient evidence of a drug conspiracy and whether a shooting had occurred in relation to that conspiracy, the Fifth Circuit relied heavily on circumstantial evidence of an agreement related to drug distribution that reflected a shared goal. *Id.* at 586-88. The court found a conspiracy based on the fact that (1) "[t]he police repeatedly arrested most of the appellants for selling drugs in a small area," (2) "[w]itnesses testified that a few of the appellants provided drugs to the others," (3) one of the appellants "interrupted a drug sale to an undercover agent," and (4) "the defendants shared a motive to profit from drug sales, and they depended upon each

13

other because they warned each other of police activity." *Id.* at 587. In the next paragraph, the court mentioned that "[t]here was considerable other evidence of an agreement," including the fact that "many of the appellants responded to the murders of their friends with killing sprees against the rival group of drug dealers." *Id.* Finally, as to the issue of whether the firearm was used in relation to the conspiracy, the court explained that the Government "had to show that these appellants could have used the weapons to protect or facilitate their drug operation, and that the weapons were in some way connected with drug trafficking." *Id.* at 588.

If anything, *Baptiste* further calls into question Korey's jury instructions. The Fifth Circuit did not find a conspiracy simply because many of the defendants had murdered members of a rival group of drug dealers; rather that point was added after finding sufficient evidence of a "shared . . . motive to profit from drug sales" based on a pattern of behavior. *Id.* at 587.

In the present case, however, the jury instructions commanded the jury to find a conspiracy without looking into the overarching context to find a shared motive. All the Government had to prove was that Korey "agreed to accept cocaine in payment for killing Billy Kuhn." The jury was not permitted to consider whether the Government proved a "unity of purpose" to distribute cocaine. *See Gibbs*, 190 F.3d at 197. Under the instructions, Korey could have been found guilty even if he only agreed to murder Kuhn to obtain drugs for himself and had no interest in whether Erfort ever made another drug sale. It is possible that Korey killed Kuhn because of some enforcement role he was playing in Erfort's cocaine distribution

14

scheme.[3] But the instructions did not require the jury to so find in order to convict him. All the Government had to prove was that Korey accepted drugs as a payment for murdering Kuhn. This relieved the Government of its burden to prove beyond a reasonable doubt that there was a shared goal – a vital aspect of a conspiracy. As such, the jury instructions here violated Korey's due process rights. *See Carella*, 491 U.S. at 265 (1989).

## III.

Not all errors mandate reversal. When the error found is of a constitutional nature, a court may nonetheless uphold the conviction if the error was "harmless beyond a reasonable doubt." *Sullivan v. Louisiana*, 508 U.S. 275, 279 (1993). In other words, the Government must show "'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" *Id.* (quoting *Chapman v. California*, 386 U.S. 18, 24 (1967)). As the Supreme Court explained, "[t]he inquiry . . . is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in this trial was surely unattributable to the error." *Id.*

---

[3]We do not mean to suggest with our holding in this case that a hit man hired by a drug distribution conspiracy cannot be a part of the conspiracy. Rather, we simply hold that the jury instructions in this case did not properly instruct the jury about all of the elements the Government must prove to establish participation in such a conspiracy.

15

In *Whitney v. Horn*, 280 F.3d 240 (3d Cir. 2002), we reviewed the propriety of the jury instructions used to find a defendant guilty of first degree murder. The instruction at issue provided that:

> Thus, you cannot find the defendant guilty of first degree murder unless you are satisfied beyond a reasonable doubt that the defendant was so intoxicated at the time that he was incapable of judging his acts and their consequences or incapable of forming a willful, deliberate and premeditated design to kill.

*Id.* at 254-55. In fact, this was an incorrect statement of the law: it should have read "was *not* so intoxicated." While holding that this jury instruction as to the defendant's state of mind was in error, we observed that "[a] verdict may still stand, despite erroneous jury instructions, where the predicate facts 'conclusively establish intent, so that no rational jury could find that the defendant committed the relevant criminal act but did not intend to cause the injury.'" *Id.* at 260 (quoting *Rose v. Clark*, 478 U.S. 570, 580-81 (1986)). We went on to determine that "[f]aced with th[e] evidence we do not understand how *any* reasonable jury could have had any doubt about whether Whitney was too inebriated to form the intent to kill. The evidence of Whitney's mental state was nothing short of overwhelming." *Id.* at 261 (emphasis in original). Not only was there strong circumstantial evidence of his intent based on the number and severity of the wounds to the victim, but the defendant had announced his intent to kill. *Id.* at 259; *see also United States v. Neder*, 527 U.S. 1, 17 (1999) (finding that a failure to instruct the jury as to an element of the charged crime

16

was harmless where evidence concerning the omitted element was overwhelming and uncontested).

In contrast, we are unable to say that "the guilty verdict actually rendered in this trial was surely unattributable to the error." *Sullivan*, 508 U.S. at 279. The only evidence presented by the Government concerning Korey's participation in the cocaine distribution conspiracy is that, until Erfort's arrest in 1998, Kuhn and Erfort had worked together for years as cocaine and crack dealers, that Korey knew both men and knew they were drug dealers, and that he considered Kuhn a friend. There was no evidence that Korey shared the goal of cocaine distribution at all, or that his involvement with Kuhn and Erfort was anything other than personal. Even if we were to determine that this evidence, coupled with Korey's agreement to accept cocaine in payment for killing Billy Kuhn, is sufficient to find that Korey was part of a drug distribution conspiracy, it is far from overwhelming. We cannot say beyond a reasonable doubt that the error did not contribute to the verdict rendered. Thus, the error was not harmless.

## IV.

Because we have determined that Korey's conviction must be vacated on the basis of the jury instructions, it is unnecessary for us to reach the remainder of his claims. However, we do wish to briefly comment on the problematic apology speech that the District Court allowed the prosecutor to deliver in the presence of the jury.

In essence, the Court gave the prosecutor an opportunity to bolster his reputation through personal contact with the jury that was not similarly afforded to defense counsel. The resulting

17

comments inappropriately injected the character and experience of the attorney into the trial in a manner that has worried us in the past. *See United States v. Schartner*, 426 F.2d 470, 478 (3d Cir. 1970) (finding remarks that "invite the jury to rely on the Government attorney's experience in prosecuting criminals generally and on the Government attorney's 'sincerity'" constitute reversible error). In the future, district courts would be well advised to avoid such issues by restricting attorneys to a simple "I'm sorry" – even one that is delivered after the verdict is rendered – when responding to questionable conduct.

V.

For the foregoing reasons, we will vacate Jason Korey's conviction under 18 U.S.C. § 924, and remand for new proceedings consistent with this opinion.

*United States v. Korey*, No. 05-3840

SMITH, *Circuit Judge*, concurring.

As the majority ably explains, the charge to the jury was deficient because it failed to instruct on the "unity of purpose" element required for the predicate drug trafficking offense. *See United States v. Gibbs*, 190 F.3d 188, 197 (3d Cir. 1999) (explaining that a drug conspiracy requires that the "government must establish a unity of purpose between the alleged

18

conspirators, an intent to achieve a common goal, and an agreement to work together toward that goal"). Like the majority, I conclude that this deficiency was not harmless and requires that Korey's conviction be vacated. I write separately, however, because my analysis, based on the Supreme Court's decision in *United States v. Neder*, 537 U.S. 1 (1999), diverges from that of the majority.

In *Neder*, the Supreme Court determined that the omission of an essential element from a jury charge is subject to harmless error review. *Id.* at 15. Because there was overwhelming and undisputed evidence regarding the omitted element, the Court concluded that the deficient jury instruction was harmless error. *Id.* at 18. The Court instructed that a reviewing court must "conduct a thorough examination of the record. If at the end of that examination, the court cannot conclude beyond a reasonable doubt that the jury verdict would have been the same absent the error, for example, where the defendant contested the omitted element and raised evidence sufficient to support a contrary finding - it should not find the error harmless." *Id.* at 19.

In my view, *Neder* teaches that the focus in deciding if the omission of an instruction on an element of an offense is harmless is on whether there is *any* evidence to establish the omitted element. If there is no evidence on the omitted element, the deficiency in the instruction is not harmless because a jury could not have found that the prosecution proved this element beyond a reasonable doubt. Likewise, if there is evidence on the

omitted element and it is contested, the deficiency in the instruction is not harmless because the jury would need to deliberate on the evidence and decide whether the element had been proved beyond a reasonable doubt. However, when there is evidence on the omitted element that is not disputed, then the deficient instruction is harmless because "answering the question of whether the jury verdict would have been the same absent the error does not fundamentally undermine the purposes of the jury trial guarantee." *Id.* at 19.

Applying *Neder* to this case compels the conclusion that the deficient jury instruction was not harmless error because, as the majority correctly points out, "[t]here was no evidence that Korey shared the goal of cocaine distribution at all, or that his involvement with Kuhn and Erfort was anything other than personal." Slip op. at 17.

Having concluded that there was no evidence on the omitted "unity of purpose" element, the analysis should be complete. The majority, however, goes on to reason that "[e]ven if we were to determine that this evidence . . . is sufficient to find that Korey was part of a drug distribution conspiracy, [the error is not harmless because the evidence] is far from overwhelming." Slip op. at 17. In my view, this additional step is unnecessary and runs afoul of *Neder*. If the evidence offered at trial was sufficient to demonstrate the unity of purpose element and was undisputed, as the majority states, *Neder* instructs that the error was harmless. 537 U.S. at 18 (instructing that where there is uncontroverted evidence on the

20

omitted element the error is harmless).  For this reason, I cannot join this aspect of the majority's analysis and consider it dictum.